## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

Regional International Corp., on behalf of itself and all others similarly situated,

                                    Plaintiff,

            v.

Espar Inc. and Espar Products Inc.,

                                    Defendants.

Case No. 1:15-cv-01798

### CLASS ACTION COMPLAINT

### JURY TRIAL DEMANDED

1.      Plaintiff Regional International Corp., on behalf of itself and all others similarly situated, asserts claims for violations of federal antitrust law against Espar Inc. and Espar Products Inc. (collectively "Espar" or "Defendants"), as well as Defendants' unnamed co-conspirators, arising from a conspiracy to fix prices for parking heaters (including the heaters themselves, accessories sold for use with heaters, and packaged kits containing heaters and selected accessories) sold in the aftermarket for use in commercial vehicles from on or before October 1, 2007 through at least December 31, 2012 (the "Class Period").

2.      Plaintiff's claims are made on information and belief except as to allegations specifically pertaining to Plaintiff and its counsel, which are made on personal knowledge.

### NATURE OF THE ACTION

3.      This case arises from a conspiracy to fix prices for air parking heaters (that work by heating interior or outside air drawn into the heating unit) and water (or "coolant") parking

heaters (that are integrated into the engine coolant circuit and heat the engine as well as the interior compartment) sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories (collectively "Parking Heaters", unless otherwise differentiated).  These Parking Heaters are used in a wide variety of commercial vehicles to keep the cabin or other compartment of the vehicle warm while the operator of the vehicle rests, thereby eliminating the need for the vehicle to idle, which is economically wasteful, harmful to the environment and potentially dangerous for the operator.  The term "aftermarket", as used in this Complaint, refers to the purchase of Parking Heaters for installation in a vehicle after it has been sold by the original vehicle manufacturer.

4.     Throughout the Class Period, Defendants and their unnamed co-conspirators conspired to, and did, fix prices on Parking Heaters.  By acting together and in concert to fix prices, Defendants and their unnamed co-conspirators caused the price of Parking Heaters to be artificially high, reaping millions of dollars from unlawful overcharges.  The Defendants and/or their unnamed co-conspirators sold Parking Heaters directly and indirectly to purchasers, including to Plaintiff, during the Class Period.

5.     A government investigation into anticompetitive conduct in the market for Parking Heaters is ongoing at least in the United States, with one conspirator – Defendant Espar Inc. – pleading guilty to one count of violating the Sherman Act on March 12, 2015.  *See* "Plea Agreement" (March 12, 2015) (Dkt. No. 16), filed in *United States v. Espar, Inc.*, No. 1:15-cr-00028 (E.D.N.Y.) ("*Espar*").  Espar Inc. will be sentenced on June 5, 2015.

6.     The price-fixing conspiracy in which the Defendants and their unnamed co-conspirators engaged allowed them to charge Plaintiff and members of the Classes alleged herein

more for Parking Heaters than they would has been able to charge absent the conspiracy. Accordingly, on behalf of itself and members of the alleged classes, Plaintiff seeks relief for the injuries suffered as a result of Defendants' violations of federal and state antitrust laws and state consumer protection law.  Plaintiff asserts claims under the Sherman Act (15 U.S.C. §§ 1, *et seq.*), the Clayton Act (15 U.S.C. §§ 12, *et seq.*) and the various state laws alleged below.

## JURISDICTION AND VENUE

7.      This action arises under Section 1 of the Sherman Act (15 U.S.C., § 1), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

8.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

9.      Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act (15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d)).  Defendants reside, transact business, are found or have agents in the District, a substantial part of the events giving rise to Plaintiff's claims arose in the District and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## THE PARTIES

### Plaintiff

10.     Plaintiff Regional International Corp., is a commercial truck dealership, whose principal place of business is in Henrietta, New York.  Plaintiff indirectly purchased Parking Heaters from Espar and/or one of its unnamed co-conspirators during the Class Period, paying more for the Parking Heater than it would have absent the anticompetitive conduct of Defendant and its unnamed co-conspirators, and was injured as a result.

### Defendant

11.     Defendant Espar Inc. is an Illinois corporation headquartered in Novi, Michigan.

Espar Inc. has pled guilty for its role in the conspiracy alleged herein.  Espar Inc. executed the plea agreement cited above with the United States Department of Justice ("DOJ"), which was entered by Judge John Gleeson of the United States District Court for the Eastern District of New York on March 12, 2015.  Espar Inc.'s sentencing is scheduled for June 5, 2015.

12.     Defendant Espar Products Inc. is an affiliate of Defendant Espar Inc.

13.     Espar, directly and through some of their affiliate corporations, sold Parking Heaters in the United States for commercial use in the aftermarket during the Class Period.

## UNNAMED CO-CONSPIRATORS

14.     Various other entities and individuals not named as defendants in this Complaint participated as co-conspirators in the acts complained of and performed acts and made statements that aided and abetted and furthered the unlawful conduct alleged herein.

## CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of itself and all others similarly situated, seeking injunctive relief.  The "Nationwide Injunctive Relief Class" is defined as:

> All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in the United States, indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

16.     Plaintiff also brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and all others similarly situated, seeking disgorgement and other equitable relief pursuant to Section 1 of the Sherman Act (15 U.S.C., § 1), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).  The "Nationwide

Equitable Relief Class" is defined as:

> All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in the United States, indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

17.     In the event that the Court certifies the Nationwide Equitable Relief Class, Plaintiff will seek certification, under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, of statewide subclasses asserting claims for damages under the antitrust and/or consumer protection statutes of the following thirty-one (31) jurisdictions: Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin (collectively, "the State Law Damages Subclasses").  In the event that the Court does not certify the Nationwide Equitable Relief Class, Plaintiff will seek certification of these state-wide classes as discrete classes asserting damages under their various antitrust and/or consumer protection statutes.

18.     The definitions of the State Law Damages Subclasses or Classes are:

> (a)     **Arizona**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Arizona indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

> (b)     **Arkansas**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that

purchased in Arkansas indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(c)      **California**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in California indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(d)      **District of Columbia**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in District of Columbia indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(e)      **Florida**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Florida indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(f)      **Hawaii:**  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Hawaii indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(g)  **Illinois**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Illinois indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(h)  **Iowa**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Iowa indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(i)  **Kansas**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Kansas indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(j)  **Maine**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Maine indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(k)  **Massachusetts**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Massachusetts indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories

("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(l)      **Michigan**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Michigan indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(m)      **Minnesota**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Minnesota indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(n)      **Mississippi**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Mississippi indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(o)      **Missouri**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Missouri indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(p)      **Montana**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Montana indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the

aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(q)    **Nebraska**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Nebraska indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(r)    **Nevada**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Nevada indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(s)    **New Hampshire**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in New Hampshire indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(t)    **New Mexico**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in New Mexico indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(u)    **New York**:  All persons or entities (other than Defendants

and their employees, affiliates, parents, and subsidiaries) that purchased in New York indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(v)      **North Carolina**:    All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in North Carolina indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(w)      **North Dakota**:    All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in North Dakota indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(x)      **Oregon**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Oregon indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(y)      **South Carolina**:    All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in South Carolina indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and

December 31, 2012 (the "Class Period").

(z)  **South Dakota**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in South Dakota indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(aa)  **Tennessee**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Tennessee indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(bb)  **Utah**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Utah indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(cc)  **Vermont**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Vermont indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(dd)  **West Virginia**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in West Virginia indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles,

including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

(ee)   **Wisconsin**:  All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in Wisconsin indirectly from a Defendant or one of its co-conspirators, an air or coolant parking heater sold in the aftermarket for use in commercial vehicles, including the heaters themselves, accessories sold for use with the heaters and packaged kits containing heaters and select accessories ("Parking Heaters") at any time between October 1, 2007 and December 31, 2012 (the "Class Period").

19.     The Nationwide Injunctive Relief Class, the Nationwide Equitable Relief Class and the State Law Damages Subclasses (or Classes) are collectively referred to as the "Classes" unless otherwise indicated.  Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, Defendants' attorneys in this matter, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, all judges assigned to this matter, all jurors in this matter, and all persons and entities who only purchased Parking Heaters directly.

20.     The Classes are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown at this time, Plaintiff is informed and believes that, due to the nature of the trade and commerce involved, at least hundreds of thousands of geographically dispersed Class members purchased Parking Heaters indirectly from Defendant or one of its co-conspirators during the Class Period.

21.     Plaintiff's claims are typical of the claims of the other members of the Classes. Plaintiff and the members of the Classes sustained injury and are threatened with future injury arising out of the common course of conduct of Defendants and their unnamed co-conspirators in violation of law as complained herein.  The injuries to each member of the Classes were caused

by the wrongful conduct of Defendants and their co-conspirators in violation of federal and state antitrust laws and state consumer protection laws, as alleged herein.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Classes and has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

23.     Common questions of law and fact exist as to all members of the Classes which predominate over any questions affecting solely individual members of the Classes.  Among the questions of law and fact common to all members of the Classes are:

(a)     whether Defendants and their co-conspirators engaged in a contract, combination and/or conspiracy to fix, raise, maintain and stabilize prices of Parking Heaters sold in the United States and/or for delivery into the United States;

(b)     the identity of the participants in the conspiracy;

(c)     the duration of the conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     whether the conspiracy violated the Sherman Act;

(e)     whether the conduct of Defendants and their co-conspirators caused injury to the businesses and property of the Plaintiff and the other members of the Class;

(f)     the effect of the conspiracy on the prices of Parking Heaters sold in the United States and/or for delivery into the United States during the Class Period; and

(g)     the appropriate injunctive and equitable relief.

Questions common to members of each of the State Law Damages Subclasses (or Classes) include, in addition to all of the issues listed above, any individual requirements for proof of violation and damages under their individual state laws.

24.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Classes would impose heavy burdens upon the courts and the Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Classes.  A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

25.     The interest of members of the Classes in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Classes have a high degree of cohesion, and prosecution of the action through representatives should be unobjectionable.  The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.  Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## TRADE AND COMMERCE

26.     Throughout the Class Period, Defendants and their unnamed co-conspirators manufactured, sold and shipped substantial numbers of Parking Heaters in a continuous and uninterrupted flow of interstate commerce throughout the United States, including in this District.

27.     The unlawful activities of Defendants and their unnamed co-conspirators that are the subject of this Complaint were within the flow of, and had a direct and substantial effect on, interstate trade and commerce.

## FACTUAL ALLEGATIONS

## I.        FACTUAL BACKGROUND ON PARKING HEATERS.

28.        Operators of commercial vehicles, such as large commercial trucks, often rest or sleep in their vehicles, in cold weather or at night and need a way to keep warm.  For many such drivers, idling the vehicle may be the only way to provide heat to the cabin.  Idling, however, is inefficient and runs afoul of ever-increasing anti-idling laws.

29.        Parking Heaters offer a solution to this problem, providing heat without the need to idle the engine.  Indeed, the Environmental Protection Agency itself has recommended Parking Heaters as one way to mitigate idling's deleterious environmental and financial impact:

> Install a small generator or auxiliary power unit specifically designed for a truck that provides heat, air conditioning, and/or electrical power while the vehicle is not in motion. These devices are a better, more efficient alternative to idling as they use substantially less fuel and emit less pollution.  Depending on the amount of time spent idling each year, the payback on these devices can be one to two years.[1]

30.        Defendants and their co-conspirators sell two primary types of Parking Heaters: (a) air heaters, which work by heating interior or outside air drawn into the heater unit; and (b) water or "coolant" heaters, which are integrated into the engine coolant circuit and heat the engine as well as the interior compartment.

31.        Defendant Espar's Hydronic coolant Parking Heaters work much the way a hot water furnace operates in a home, heating coolant and circulating it for pre-heating.  This line of heaters can be used to preheat an engine, fuel, hydraulics and other service fluids – and provide supplementary heat to the vehicle's cabin.[2]

---

[1] "What You Should Know About Truck Engine Idling," Environmental Protection Agency, New England (April 2002), available at
http://www.epa.gov/region1/eco/diesel/pdfs/Diesel_Factsheet_Truck_Idling.pdf.

[2] Brochure from Volvo on Espar Components, available at:
http://www.espar.com/fileadmin/data/countrysites/EB_Kanada/pdf/Volvo_Brochure_WEB_REA

*Footnote continued on next page*

32.     Espar's coolant Parking Heaters, such as its Hydronic systems, are largely intended to heat engine parts.  In these systems, fuel and air are combined, which generates heat in the combustion chamber.  The heater's water-pump then warms up, which causes engine coolant to circulate throughout the vehicle's engine's cooling system to transfer heat to the engine.  Heating of the cabin is a supplementary effect of this type of system.[3]  These fuel-operated coolant systems are small, weighing approximately six to seven pounds.[4]

33.     Espar's air Parking Heaters, such as Espar's Airtronic Heaters, sometimes called bunk heaters, act like small furnaces.  They have a heating element and a blower to provide heat either through a direct duct or through a vehicle's factory-installed HVAC ducting.  Like the coolant-based systems, these air Parking Heaters are small, weighing between six to eight pounds and are approximately the size of a loaf of bread.[5]

34.     Espar's air Parking Heaters, such as Espar's Airtronic Heaters are highly efficient, typically using as little as .02 to .13 gallons of fuel an hour.  The average air Parking Heater burns no more than a gallon of fuel every 24 hours.[6]

35.     Unlike coolant heating systems, which are integrated directly into a vehicles coolant circuit, Airtronic Parking Heaters and other air Parking Heaters work independent of the vehicle's existing heating and cooling system, allowing them to warm the compartment quickly.[7]

36.     Espar's air Parking Heaters range in price from $800 to $1500, depending on

---

*Footnote continued from previous page*
DY_10%EF%80%A208%EF%80%A213.pdf.

[3] Trucking Efficiency, Confidence Report: Idle-Reduction Solutions (2014), at 35.

[4] *Id.*

[5] *Id.*, at 34.

[6] *Id.*

[7] "Espar Climate Control Systems, Auxiliary Heaters for All Markets," at 3, available at:
http://www.espar.com/fileadmin/data/countrysites/EB_Kanada/pdf/All_Market_Brochure_WEB_READY_021014_.pdf

-16-

type, and require minimal maintenance.[8]

37.     The main goal of each of these types of units is to provide a cheaper and more efficient means of keeping the operator's cabin warm without the waste of idling the vehicle. Espar Inc.'s Airtronic line of air Parking Heaters, for example, is designed "for cab and sleeper heat in trucks, workshop vehicles, freight compartments and interior heat in general" – all without idling the vehicle's engine.[9]

38.     Defendant Espar is one of the largest suppliers of Parking Heaters in North America, with over $62 million in commerce in Parking Heaters in the United States during the Class Period.[10]

39.     The conspiracy alleged herein only involves fuel-operated Parking Heaters used in commercial vehicles, as reflected in the aforementioned plea agreement.  Both coolant Parking Heaters such as Espar's Hydronic Coolant Parking Heaters, and air Parking Heaters, such as Espar's Airtronic Parking Heaters, were subject to the conspiracy, which also encompassed Parking Heater accessories and Parking Heater kits, in which both the Parking Heater and the accessories were sold together.

## II.     ESPAR AND ITS CO-CONSPIRATORS AGREED TO FIX PRICES FOR PARKING HEATERS.

40.     Espar and its co-conspirators had clandestine meetings and discussions, at which they agreed to fix, raise or maintain prices for Parking Heaters.

41.     The conspiracy consisted of a continuing agreement, understanding, and concert

---

[8] Trucking Efficiency, Confidence Report: Idle-Reduction Solutions (2014), at 35-36.

[9] Espar AIRTRONIC D2/D4/D5 Spec. Sheet, available at: www.espar.com/fileadmin/data/countrysites/EB_Kanada/pdf/Airtronic_D2-D4-D5_Spec_sheet.pdf.

[10] Frank Stodolsky, *et al.*, Analysis of Technology Options to Reduce the Fuel Consumption of Idling Trucks (June 2000) at 9; Trucking Efficiency, Confidence Report: Idle-Reduction Solutions (2014), at 34-37.

of action among Espar and its co-conspirators, the substantial terms of which were to fix, stabilize, and maintain prices of commercial vehicle Parking Heaters sold into the aftermarket in the United States, as well as elsewhere in North America.

42.     As part of the conspiracy, Espar and its co-conspirators discussed Parking Heater prices in the aftermarket, and agreed to set a price floor for Parking Heater kits, and to coordinate the timing and amount of price increases.

43.     Espar and its co-conspirators also agreed to exchange, and did exchange, information in order to monitor and enforce adherence to the agreement.

## III.    THE STRUCTURE OF THE PARKING HEATER INDUSTRY IS CONDUCIVE TO COLLUSION.

44.     Defendants and co-conspirators sell Parking Heaters in the aftermarket through distributors and dealers, as well as to original equipment manufacturers.  In addition to other methods, Espar engages in contracts with "Master Service Dealers," with assigned market territories, to which it sells Parking Heaters.  These Master Service Dealers are authorized to sell, install and repair its heaters.  Master Service Dealers are required to purchase a minimum dollar value of Espar's products and promote Espar's products through trade fair exhibitions and via dealers' sales forces, and maintain a network of subdealers and warranty depots to support Espar sales.  Espar has a network of more than 250 dealers who sell its products across the country.

45.     Three companies dominate the Parking Heater market.  They are Defendant Espar, Webasto Product North America, Inc./Webasto Thermo & Comfort North America, Inc., and Proheat.[11]

46.     Webasto Product North America, Inc. is headquartered in Rochester Hills,

---

[11] Marek Krasusi, Evolving Technologies Dominate Industry, Western Trucking News (Dec. 2011); *see also* Trucking Efficiency, Confidence Report: Idle-Reduction Solutions (2014), at 34-35.

Michigan, and its affiliate, Webasto Thermo & Comfort North America, Inc., which manufactures parking heaters for commercial and other vehicles, is headquartered in Fenton, Michigan, where it also operates a manufacturing plant.  Webasto Thermo & Comfort SE of Gilching, Germany owns both Webasto Product North America, Inc. and Webasto Thermo & Comfort North America, Inc. (collectively, "Webasto").  Webasto manufactures the Air Top 2000 ST and the Air Top Evo 40/55 air Parking Heaters for commercial vehicles and heavy machinery.  Webasto also manufactures four types of coolant Parking Heaters.  Webasto promotes itself as the "world market leader" for interior cab and coolant heaters.[12]  Its heating and cooling systems division accounts for 20% of its more than €2.5 billion sales volume.[13] North America is one of its top markets.

47.    Marine Canada Acquisition Inc. ("Proheat") is based in British Columbia, Canada and manufactures air auxiliary heaters for heavy-duty vehicles, including the Proheat Air Parking Heater, along with a Proheat X45 coolant Parking Heater, available in both 2 and 4 kilowatt models, capable of heating both the engine block and the truck cab.

48.    The global market for Parking Heaters is highly concentrated, with Webasto alone accounting for 75% of the global Parking Heater market.

49.    Espar manufactures and sells Parking Heaters that are interchangeable and in competition with Parking Heaters offered by other manufacturers, including Espar's main competitors Webasto and Proheat.  All Parking Heaters serve the same purpose; that is they provide an alternative to engine idling to provide heat to a compartment and/or to vehicle equipment.  Parking Heaters produced by the dominant manufacturers also have generally

---

[12] http://www.webasto.com/us/markets-products/truck/heating-systems/
[13] Webasto Press Release, *Webasto remains on global growth path* (May 22, 2014), available at http://www.webasto-group.com/int/press-zwnjevents/press-releases/news-article/webasto-remains-on-a-global-growth-path/?no_cache=1

comparable product attributes, such as fuel consumption rates, heat output, electrical

consumption and weight.  As such, Parking Heater purchasers are likely to be influenced by

price when making a decision regarding which Parking Heater to purchase.  In this regard,

Parking Heaters act as commodity-like products.

50.    Espar and its leading competitor Webasto manufacture the two leading fuel-

operated heaters on the market: Espar's Airtronic D2 and Webasto's Air Top 2000; both expend

only one gallon of fuel over 20+ hours of operation, come with a built-in thermostat and operate

in a similar manner, drawing air and fuel into a heat exchanger.[14]

51.    In addition to aftermarket sales, Webasto and Espar are also the key suppliers to

original equipment manufacturers.  Parking Heaters are available as factory-installed options, or

sold to commercial truck dealers, like Plaintiff, for installation in new and used trucks.  Every

major truck manufacturer offers optional fuel-operated Parking Heaters made by either Webasto

or Espar.[15]

52.    Fuel-operated Parking Heaters have few substitutes.  Alternative technologies for

heating truck cabs, such as auxiliary power units ("APUs") or generator set systems ("gen-sets"),

which incorporate an HVAC system, cost three to eight times as much as Parking Heaters.[16]  For

example, a gen-set can cost upwards of $8,000 or more compared to Parking Heaters' price tag

of often less than $1,500.  APUs and gen-sets are more complex to install, add significant weight

to the truck cab and require more maintenance.[17]  Parking Heaters, however, can be installed in a

---

[14] Overdrive staff, *Cold Remedy*, Overdriveonline.com (Dec. 12, 2008), available at:
http://www.overdriveonline.com/cold-remedy/

[15] Trucking Efficiency, Confidence Report: Idle-Reduction Solutions (2014), at 69.

[16] *Id*. at 34-35.

[17] *Id.*

few hours by drilling a few holes and running fuel lines.[18]  And battery powered APUs have a

limited runtime of about 10 hours.[19]  As such, Parking Heaters constitute a distinct product

market.

53.     There are also high barriers to entry to the Parking Heater industry in the form of

technical know-how, including the manufacturing expertise required to make efficient, safe

Parking Heaters, and access to distribution channels.  Moreover, Espar's "Master Service

Dealers" are not permitted to manufacture, distribute or promote competing products within their

designated territories, foreclosing potential entrants' access to key distribution channels.[20]

54.     Espar had the opportunity to collude with its competitors through Espar's

participation at industry trade shows.  By way of example, Espar and Webasto, one of Espar's

main competitors in the Parking Heater industry, both attended the NTEA World Truck Trade

Show, held March 4-7, 2014 in Indianapolis, Indiana.

55.     Espar and Webasto also attended the TMC Annual Meeting & Transportation

Technology Exhibition held March 10-13, 2014 in Nashville, Tennessee, as promoted by the

American Trucking Association, as well as Truck-World-Canada's National Truck Show held

April 10-12, 2014 in Toronto, Canada.

56.     These trade shows provided Espar ample opportunity to conspire with other

Parking Heater industry participants.

57.     In addition, Espar and competitors Webasto and Proheat are all scheduled to

---

[18] *Id.*

[19] Denise Koeth, *Auxiliary Power Unit Update*, fleetequipmentmag.com (Sept. 10, 2012), available at, http://www.fleetequipmentmag.com/auxiliary-power-unit-update.

[20] Espar MSD Program & Policy Manual (July 30, 2010), available at http://www.espar.com/fileadmin/data/countrysites/EB_Kanada/pdf/QSF-146_Rev_2_Espar_MSD_Contract_2010_2011.pdf.

attend the Mid-America Trucking Show, which is to occur between March 26 and March 28, 2015 in Louisville, Kentucky.

58.     The commodity-like nature of Parking Heaters, along with the high barriers to entry into the industry and the fact that the market is highly concentrated, make the Parking Heater market susceptible to anticompetitive conduct and make the conspiracy alleged herein plausible, particularly in light of the opportunities Espar and its unnamed co-conspirators had to conspire at the various trade show meetings they each attended.

## IV.    GOVERNMENT INVESTIGATIONS OF PARKING HEATER INDUSTRY AND DEFENDANT ESPAR

59.     At least since January 26, 2015, the United States, through the New York office of the Antitrust Division of the DOJ has been investigating unlawful and anticompetitive conduct in the Parking Heater industry.

60.     As a result of the investigation, the criminal case cited above was brought against Defendant Espar Inc., which was assigned to the Honorable John Gleeson of the Eastern District of New York.

61.     On March 12, 2015, Defendant Espar Inc. pled guilty to violating one count of the Sherman Act for its participation in the conspiracy alleged herein.  According to the charge, Defendant Espar Inc. and its co-conspirators discussed Parking Heater prices for commercial vehicles, agreed to set a price floor for Parking Heater kits (which include accessories used when a Parking Heater is installed) sold for use in commercial vehicles on the aftermarket and agreed to coordinate the timing and amount of price increases.[21]  The conspirators also agreed to exchange, and did exchange, information in order to monitor and enforce adherence to the

---

[21] DOJ Press Release, "Parking Heater Company Pleads Guilty in Price-Fixing Scheme" (Mar. 12, 2015), available at http://www.justice.gov/atr/public/press_releases/2015/312477.htm.

agreement.[22]

62.     As the criminal Information that accompanied Defendant Espar Inc.'s plea makes

clear:

> During the [Class Period], for the purpose of forming and carrying out the
> charged conspiracy, the defendant [Espar Inc.] and its co-conspirators knowingly
> did those things that they combined and conspired to do, including, among other
> things:
>
>     (a) participating in communications, discussions, and meetings in the
> United States and elsewhere to discuss aftermarket prices for [Parking Heaters]
> for commercial vehicles;
>
>     (b) agreeing, during those conversations and meetings, to set a price floor
> for [Parking Heater] kits for commercial vehicles sold to aftermarket customers in
> the United States and elsewhere in North America;
>
>     (c) agreeing, during those conversations and meetings, to coordinate the
> timing and amount of price increases for [Parking Heaters] for commercial
> vehicles sold to aftermarket customers in the United States and elsewhere in
> North America;
>
>     (d) exchanging information during those conversations and meetings for
> the purpose of monitoring and enforcing adherence to the agreements described in
> subparagraphs (b) and (c) above; and
>
>     (e) selling [Parking Heaters] for commercial vehicles to aftermarket
> customers at collusive and non-competitive prices in the United States and
> elsewhere in North America.[23]

63.     Attachment A to the plea agreement contains the names of individuals "who have

not received protection under the plea agreement but who have not been indicted."[24]

64.     Espar Inc. agreed to pay a criminal fine of $14,970,000.  No requirement to pay

restitution to those harmed by Espar Inc.'s conduct is contained within the plea.

65.     Following Defendant Espar Inc.'s plea agreement, the DOJ issued a press release

---

[22] *Id.*

[23] "Information" (March 12, 2015) filed in *Espar* (Dkt. No. 13).

[24] Letter to Judge Gleeson from Carrie Syme of the Department of Justice, on behalf of the
Department of Justice and counsel for Espar, filed in *Espar*, 15-cr-0028  (Dkt. No. 2).

stating that, "Today's plea demonstrates the [DOJ's] Antitrust Division's commitment to holding companies accountable for conspiracies that fix prices on parts used in every day products."[25] Assistant Attorney General Bill Baer, who leads the Antitrust Division of the DOJ, also stated that "The Antitrust Division will vigorously prosecute companies that engage in schemes that subvert normal competitive processes and defraud American consumers and businesses."[26]

66.     Espar confirmed that it entered into a plea agreement for collusion related to Parking Heaters, with Espar's vice president of marketing and communication, John Dennehy, verifying the Department of Justice investigation into Espar's anticompetitive activity and stating that Espar "has cooperated fully with the US Department of Justice throughout this investigation."[27]

67.     In addition, a fleet manager at a trucking company who was affected by the conspiracy also confirmed that he had received paperwork notifying him of the case against Espar.[28]

68.     The DOJ has confirmed that its investigation into a conspiracy to fix prices for Parking Heaters is ongoing.[29]   As part of its plea agreement, Defendant Espar Inc. has agreed to cooperate with the DOJ in its ongoing investigation into the conspiracy alleged herein.  This

---

[25] DOJ Press Release, "Parking Heater Company Pleads Guilty in Price-Fixing Scheme" (Mar. 12, 2015), available at http://www.justice.gov/atr/public/press_releases/2015/312477.htm.

[26] *Id.*

[27] "Company colluding on parking heaters will plead guilty in US," *Global Competition Review* (February 26, 2015), available at http://globalcompetitionreview.com/news/article/38078/company-colluding-parking-heaters-will-plead-guilty-us/?utm_source=Law+Business+Research&utm_medium=email&utm_campaign=5402514_GCR+Headlines&dm_i=1KSF,37SLU,9GQ5EU,BIN9N,1

[28] *Id.*

[29] DOJ Press Release, "Parking Heater Company Pleads Guilty in Price-Fixing Scheme" (Mar. 12, 2015), available at http://www.justice.gov/atr/public/press_releases/2015/312477.htm.

cooperation includes cooperation from both Espar Defendants, as well as their German parent

companies Eberspaecher Climate Control Systems GmbH & Co. KG (formerly known as J.

Eberspaecher GmbH & Co. KG) and Eberspaecher Gruppe GmbH & Co. KG.  Pursuant to this

cooperation, Espar will provide documents to the DOJ and secure cooperation from officers,

directors and employees, including through interviews and testifying before a grand jury if so

called.

## V.      FRAUDULENT CONCEALMENT AND THE TOLLING OF
##          THE STATUTE OF LIMITATIONS

69.      Plaintiff did not discover and could not have discovered through the exercise of

reasonable diligence that it was injured by the conspiracy to fix prices for Parking Heaters until,

at the very earliest, February 26, 2015, when the United States' government investigation into

the conspiracy was revealed to the public for the first time through a news article.

70.      Before the government investigation into the Defendants' alleged misconduct was

revealed for the first time on February 26, 2015, Plaintiff could not have stated facts plausibly

suggesting a concerted and conspiratorial effort to conspire to fix prices for Parking Heaters.

71.      The unlawful activity of Espar and its co-conspirators to fix prices for Parking

Heaters was inherently self-concealing.  By its very nature, the alleged misconduct of Espar and

its co-conspirators was self-concealing.  The internal communications between Espar and their

co-conspirators were not public information, rendering impossible any ascertainment of the

specific misconduct of Espar or its co-conspirators.

72.      As a result of the self-concealing nature of the collusive scheme of Espar and its

co-conspirators, no person of ordinary intelligence would previously have discovered their

conspiracy to fix prices for Parking Heaters to the detriment of Plaintiff and the Classes.

73.      In addition, Espar made affirmative representations during the Class Period that it

priced competitively, stating in 2010, for example, that "Espar provides uncompromised quality at competitive pricing."[30]

74.    The truth – that Espar had conspired with other Parking Heater manufacturers to fix prices – was not revealed until February 26, 2015 at the earliest, when it was first reported publicly in newspaper articles that Espar Inc. would plead guilty for its participation in the conspiracy alleged herein.  Moreover, while the government investigation became public information on February 26, 2015, the facts necessary to plausibly state claims for conspiracy and manipulation were first made public on March 12, 2015, when Espar Inc. entered its guilty plea before Judge Gleeson in open court.

75.    Plaintiff and members of the Classes, therefore, had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until the government investigations became public on February 26, 2015 at the earliest.

76.    Because Espar and its co-conspirators employed acts and techniques that were calculated to wrongfully conceal the existence of such unlawful conduct, including through clandestine meetings at which information was exchanged, Plaintiff could not have discovered the existence of this unlawful conduct any earlier than its public disclosure on February 26, 2015.

77.    Because of Espar's fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Classes has been tolled during the period of such fraudulent concealment.

## DEFENDANTS' ANTITRUST VIOLATIONS

78.    During the Class Period, as explained above, Espar and its co-conspirators entered

---

[30] "Espar Can Help: Product Options to Positively Impact Our Environment" (2010), available at http://www.granitestatecleancities.nh.gov/calendar/2011/documents/espar_heaters.pdf.

into a continuing contract, combination, or conspiracy to unreasonably restrain trade and

commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and the antitrust and

consumer protection laws of the states specified in this Complaint.  Upon information and belief,

these activities included agreeing to fix, increase, stabilize and/or maintain prices of Parking

Heaters sold in the United States.

79.     The conspiracy alleged herein has had the following effects, among others:

(a)     price competition in the sale of Parking Heaters by Espar and its unnamed

co-conspirators has been restrained, suppressed and eliminated throughout the

United States;

(b)     prices charged to Plaintiff and the other members of the Classes for

Parking Heaters have been raised, fixed, maintained and stabilized at artificially

high and non-competitive levels; and

(c)     Plaintiff and the other members of the Classes have been deprived of the

benefits of free and open competition in the purchase of Parking Heaters.

80.     As a direct and proximate result of the unlawful conduct of Espar and its unnamed

co-conspirators, Plaintiff and the Classes have been injured in their business and property in that

they paid more for Parking Heaters than they otherwise would have paid in the absence of the

unlawful conduct of Espar and its unnamed co-conspirators.

**FIRST CLAIM FOR RELIEF**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**(15 U.S.C. § 1)**
**(Injunctive Relief)**

81.     Plaintiff incorporates by reference the preceding allegations.

82.     Espar and its co-conspirators entered into and engaged in a contract, combination

or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

83.     The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among Espar and its co-conspirators in furtherance of which Espar and its co-conspirators raised, fixed, stabilized and maintained prices for Parking Heaters. Such contract, combination or conspiracy constitutes a *per se* violation of the federal antitrust laws.

84.     Espar's and its co-conspirators' contract, combination, agreement or conspiracy occurred in or affected interstate and international commerce. Espar's and its co-conspirators' unlawful conduct was through mutual understanding or agreement between or among Defendants and their co-conspirators. These other co-conspirators either have acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

85.     The unlawful contract, combination or conspiracy of Espar and its co-conspirators has had at least the following effects:

(a) prices charged by Espar and its co-conspirators to Plaintiff and the members of the Classes for Parking Heaters were fixed, raised, stabilized and maintained at artificially high and non-competitive levels in the United States;

(b) Plaintiff and the other members of the Classes had to pay more for Parking Heaters than they would have paid in a competitive marketplace, unfettered by Espar's and its co-conspirators' collusive and unlawful activities;

(c) price competition in the sale of Parking Heaters was restrained, suppressed and eliminated in the United States; and

(d) as a direct and proximate result of the unlawful combination, contract or

conspiracy, Plaintiff and the members of the Classes have been injured in their business and property in that they have paid more for Parking Heaters than they otherwise would have paid in the absence of Defendants' unlawful conduct.

86.     These violations are continuing and will continue unless enjoined by this Court.

87.     Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and the Classes seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### (15 U.S.C. § 1)
### (Equitable Monetary Relief)

88.     Plaintiff incorporates by reference the preceding allegations.

89.     Espar and its co-conspirators entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

90.     The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among Espar and its co-conspirators in furtherance of which Espar and its co-conspirators raised, fixed, stabilized and maintained prices for Parking Heaters.  Such contract, combination or conspiracy constitutes a *per se* violation of the federal antitrust laws.

91.     Espar's and its co-conspirators' contract, combination, agreement or conspiracy occurred in or affected interstate and international commerce.  Espar's and its co-conspirators' unlawful conduct was through mutual understanding or agreement between or among Defendants and their co-conspirators.  These other co-conspirators either have acted willingly or,

due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

92. The unlawful contract, combination or conspiracy of Espar and its co-conspirators has had at least the following effects:

(a) prices charged by Espar and its co-conspirators to Plaintiff and the members of the Classes for Parking Heaters were fixed, raised, stabilized and maintained at artificially high and non-competitive levels in the United States;

(b) Plaintiff and the other members of the Classes had to pay more for Parking Heaters than they would have paid in a competitive marketplace, unfettered by Espar's and its co-conspirators' collusive and unlawful activities;

(c) price competition in the sale of Parking Heaters was restrained, suppressed and eliminated in the United States; and

(d) as a direct and proximate result of the unlawful combination, contract or conspiracy, Plaintiff and the members of the Classes have been injured in their business and property in that they have paid more for Parking Heaters than they otherwise would have paid in the absence of Defendants' unlawful conduct.

93. By reason of the foregoing, Plaintiff and the members of the Classes are entitled to disgorgement of all unlawful or illegal profits that may have been obtained by Defendants as a result of the anticompetitive conduct alleged herein.

### THIRD CLAIM FOR RELIEF

### VIOLATIONS OF STATE ANTITRUST AND RESTRAINT OF TRADE LAWS

94. Plaintiff incorporates by reference the preceding allegations.

95. By reason of the foregoing, Defendants have violated Arizona Revised Statutes, §§ 44-1401, *et seq.*

96.     By reason of the foregoing, Defendants have violated California Business and Professions Code, §§ 16700, *et seq.*

97.     By reason of the foregoing, Defendants have violated District of Columbia Code Annotated §§ 28-4501, *et seq.*

98.     By reason of the foregoing, Defendants have violated Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

99.     By reason of the foregoing, Defendants have violated Illinois Compiled Statutes, §§ 740 Ill. Comp. Stat. 10/1, *et seq.*

100.     By reason of the foregoing, Defendants have violated Iowa Code §§ 553.1, *et seq.*

101.     By reason of the foregoing, Defendants have violated Kansas Statutes Annotated, §§ 50-101, *et seq.*

102.     By reason of the foregoing, Defendants have violated Maine Revised Statutes, 10 M.R.S. §§ 1101, *et seq.*

103.     By reason of the foregoing, Defendants have violated Michigan Compiled Laws Annotated, §§ 445.773, *et seq.*

104.     By reason of the foregoing, Defendants have violated Minnesota Statutes §§ 325D.49, *et seq.*

105.     By reason of the foregoing, Defendants have violated Mississippi Code Annotated, 75-21-1, *et seq.*

106.     By reason of the foregoing, Defendants have violated Nebraska Revised Statutes Annotated §§ 59-801, *et seq.*

107.     By reason of the foregoing, Defendants have violated Nevada Revised Statutes Annotated, §§ 598A.010, *et seq.*

108.    By reason of the foregoing, Defendants have violated New Hampshire Revised Statutes §§ 356:1, *et seq.*

109.    By reason of the foregoing, Defendants have violated New Mexico Statutes Annotated, 57-1-1, *et seq.*

110.    By reason of the foregoing, Defendants have violated New York General Business Laws §§ 340, *et seq.*

111.    By reason of the foregoing, Defendants have violated North Carolina General Statutes, §§ 75-1, *et seq.*

112.    By reason of the foregoing, Defendants have violated North Dakota Century Code, §51-08.1-01, *et seq.*

113.    By reason of the foregoing, Defendants have violated Oregon Revised Statutes §§ 646.705, *et seq.*

114.    By reason of the foregoing, Defendants have violated South Dakota Codified Laws, §§ 37-1-3.1, *et seq.*

115.    By reason of the foregoing, Defendants have violated Tennessee Code Annotated §§ 47-25-101, *et seq.*

116.    By reason of the foregoing, Defendants have violated Utah Code Annotated, §§ 76-10-911, *et seq.*

117.    By reason of the foregoing, Defendants have violated Vermont Stat. Ann. 9 §§ 2453, *et seq.*

118.    By reason of the foregoing, Defendants have violated West Virginia Code, §§ 47-18-1, *et seq.*

119.    By reason of the foregoing, Defendants have violated Wisconsin Statues, §§

133.01, *et seq.*

## FOURTH CLAIM FOR RELIEF

### VIOLATIONS OF STATE CONSUMER PROTECTION AND
### UNFAIR COMPETITION LAWS

120. Plaintiff incorporates by reference the preceding allegations.

121. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

122. By reason of the foregoing, Defendants have violated Arkansas's laws by engaging in unfair competition or unconscionable, unfair or deceptive acts or practices in violation of AR ST §4-88-101, *et seq.*

123. By reason of the foregoing, Defendants have violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*

124. By reason of the foregoing, Defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

125. By reason of the foregoing, Defendants have violated the Massachusetts Consumer and Business Protection Act, M.G.L. c. 93A, § 1, *et seq.*

126. By reason of the foregoing, Defendants have violated Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020.

127. By reason of the foregoing, Defendants have violated Montana's Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code §§ 30-14-103 *et seq.*

128. By reason of the foregoing, Defendants have violated Nebraska's Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.*

129. By reason of the foregoing, Defendants have violated New Hampshire's

Consumer Protection Act, N.H. Rev. Stat. Ann. §§ 358-A:2, *et seq.*

130.     By reason of the foregoing, Defendants have violated New York's General Business Law, N.Y. Gen. Bus. Law § 349, *et seq.*

131.     By reason of the foregoing, Defendants have violated South Carolina's Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

132.     By reason of the foregoing, Defendants have violated Utah Code §§ 76-10-911, *et seq.*

133.     By reason of the foregoing, Defendants have violated Vermont's Consumer Fraud Act, 9 Vt. Stat. Ann. § 2451, *et seq.*

## RELIEF SOUGHT

WHEREFORE, Plaintiff prays for relief as follows:

A.     That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff Regional International Corp. be appointed as class representative, and that Plaintiff's counsel be appointed as counsel for the Classes;

B.     That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act, and the antitrust and consumer protection laws of the states specified in this Complaint;

C.     That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees, as well as all other persons acting or claiming to act on its behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

D.      That the Court order equitable relief in the form of disgorgement of all unlawful or illegal profits received by Defendants as a result of the anticompetitive conduct alleged herein;

E.      That Plaintiff and the Classes recover damages, as provided under state antitrust and consumer protection laws, and that a joint and several judgment in favor of Plaintiff and the Classes be entered against Defendants in an amount to be trebled in accordance with such laws, where applicable;

F.      That Plaintiff and the Classes recover their costs of the suit, including attorneys' fees, as provided by law; and

G.      That the Court direct such further relief it may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff Regional International Corp. demands a jury trial as to all issues triable by a jury.

Dated: April 2, 2015                              Respectfully submitted,

/s/ Lawrence H. Schoenbach

LAW OFFICES OF
LAWRENCE H. SCHOENBACH, PLLC
The Trinity Building
111 Broadway, Suite 701
New York, New York 10006
Telephone: (212) 346-2400
Facsimile: (212) 937-3100
Email:  schoenbachlawoffice@att.net

Josef D. Cooper
Tracy R. Kirkham
John D. Bogdanov
COOPER & KIRKHAM, P.C.
357 Tehama Street
Second Floor
San Francisco, CA 94103
Telephone: (415) 788-3030

-35-

Facsimile: (415) 882-7040
Email:  jdc@coopkirk.com
            trk@coopkirk.com
            jdb@coopkirk.com

Francis O. Scarpulla
LAW OFFICES OF FRANCIS O. SCARPULLA
44 Montgomery Street
Suite 3400
San Francisco, CA 94104
Telephone:   (415) 788-7210
Facsimile:  (415) 788-0706
Email:  fos@scarpullalaw.com

Philip A. Cala
Attorney at Law
Furniture Mart Office Bldg
Suite 1000
Jamestown, NY 14701
Telephone:  (716)483-2252
Email:  artlaw@windstream.net

*Counsel for Plaintiff*